## REJIRRO VELA V. THE STATE.

### No. 286.    Decided May 5.

1. **Murder—Charge—"Malice Aforethought."**—On a trial for murder, the term "malice aforethought" is sufficiently defined in a charge to the jury which instructs them, that "malice is a condition of the mind showing a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken," and which further instructed correctly as to express and implied malice.

2. **Same—Trial—Defendant Manacled.**—A defendant can not be heard to complain that on his trial he was manacled in presence of the jury, where it is made to appear that no objection or protest was offered by him, nor where the attention of the trial court was not called to the fact.

3. **Manslaughter—Charge.**—On a trial for murder, where the evidence only raises the issues of murder in the first and second degree, it is not error to fail or refuse to charge on manslaughter.

APPEAL from the District Court of Caldwell.   Tried below before Hon. H. TEICHMULLER.

This appeal is from a conviction for murder of the first degree, the penalty being assessed at death.   The murdered party was one Julia Vela, alias Juliana Zespede, who was the wife of appellant.

Dr. Aiton, witness for the State, being sworn, said: "I was called upon to see the deceased on the 30th of August, 1893, at about 3 o'clock p. m., and on reaching her I found her at Alexander & Co.'s store, with several gashes cut on her person—one in the back nearly penetrating her body, one penetrating her right lung, two in the stomach that were necessarily fatal, and a number of cuts that were of less importance.   In all there were about fourteen to sixteen wounds.   The woman died about 7 p. m. on August 31st, from the wounds."

Cross-examined: "I dressed the wounds with the assistance of Dr. Roberts.   We gave one-eighth of a grain of morphine to quiet her before moving her from the store, and in two or three hours after she had been moved we gave her one-eighth of a grain more of morphine."

Mrs. Mary Barker, witness for the State, being sworn, said: "I live at Dale, in Caldwell County, Texas, at the section house, and have known defendant since last February.   I first saw deceased, Julia Vela, at my house in last July, where she remained a short time, and left, and returned the 8th day of August last, where she remained until her death.   I saw defendant at the section house on August 30th last.   He went to work in the morning with the other section hands, and returned with them at 12 o'clock.   He did not eat dinner, but instead went to the saloon and bought some beer in a bucket and gave some of it to the other section hands, and drank some himself.   I think defendant went back to the saloon twice and brought beer after he brought the first; each time he drank and gave to the other hands.

The defendant went back to work in the afternoon with the other hands but did not remain out, but came back to the section house at about 2 or 3 o'clock. I heard that defendant was returning, and I went to the kitchen door, where I saw defendant in the kitchen coming to the door where I was. There was no one else in the kitchen at the time. Defendant came into the dining room and asked me where his wife was. I asked him what he wanted, and at the same time told him to go to his room and lie down and take a nap, and that he would feel better. He refused to go to bed, but said he wanted his wife to get his clothes; that he was going to leave the place. I told deceased that defendant wanted her to get his clothes, and that he was going to leave. The deceased then went through the dining room and entered her room to get defendant's clothes, and defendant followed her into the room. Their room opened into the dining room, and just as the defendant was entering the room the son of deceased, Patricio Hernandez, picked up the butcher knife, which was lying on the table, and followed his mother into the room. When defendant entered the room he attempted to close the door, but the boy, Patricio Hernandez, pushed in by him, and as he did so defendant took the knife away from him and started towards deceased. I, having entered the room, was at that time standing between defendant and deceased. Defendant asked deceased why she wanted to make the boy kill him. Deceased replied, 'No, no.' I tried to make defendant give me the knife, but he placed it behind him and would not let me have it, but brushed by me and began striking at deceased with the knife. I at once left the room to see after my children. Deceased got away from defendant and ran through the dining room onto the gallery, and from the gallery into the yard. After they got into the yard I did not see them. I was looking after my children. I heard defendant and deceased talking in their room the night before the killing, and from the manner of their talk thought they were quarrelling. I could not understand distinctly what they said, but understood deceased to say, 'Let me alone; I am tired.' Defendant and deceased did not speak to each other during the day, and appeared to be mad."

Joe Barker, witness for the State, testified, after being sworn: "I live with my parents at the section house in Dale, Caldwell County, Texas. I was at the section house the day defendant killed Julia Vela. Defendant went to work with the other section hands after dinner, and at about half-past 1 or 2 o'clock, while myself and Patricio Hernandez were in the car house, I saw defendant going in the direction of the section house. I followed him. He went into the kitchen where Julia Vela was washing dishes, or some dish cloths, and asked her what she had told Mrs. Barker. Deceased replied that she had told her nothing. Defendant then called her a liar, and as deceased started into my mother's room defendant struck her a blow with his fist. Deceased

then went into my mother's room. Defendant then took me out to óne side and asked me if I knew where the butcher knife was. I told him no; that I was not cook. He then went into the dining room, sat down on the table, and told my mother he wanted his clothes. My mother called Julia and told her to get defendant's clothes. She came and started into her room. Defendant followed her, and was closing the door, when Patricio Hernandez, the son of deceased, picked up the butcher knife from the dining table where defendant had been sitting and pushed in through the door. Deceased came out of the room shortly afterwards, with the defendant following her with the knife, and defendant stabbed her out in the yard several times."

J. E. Barker was section boss, and defendant was one of his hands. He tells about defendant buying the beer and bringing.it to the section house, where he and the hands drank it. When they returned to their work after dinner defendant complained that he was sick, and witness told him to lie down under the shade of a tree, and that was the last he saw of him until after his arrest for the murder. This witness testified that deceased was the wife of defendant.

Bud Riddles, witness for the State, being sworn, said: "On the 30th day of August last I was in the town of Dale, and while on my wagon I heard screaming in the direction of the section house, and on looking over there I saw the defendant out in the. yard striking at a woman with something in his hand. At that time a crowd of men from the lumber yard and store on the opposite side of the railroad track from the section house ran over to where they were. I followed them and picked up a stick and carried it with me, and when I reached the place where the man and woman were I saw some men throwing bricks at the defendant. I ran up, and with my stick struck defendant on the head with it two or three times, knocking him loose from the woman. When I reached them defendant had his left arm around the deceased, holding her, and striking her in the side with the knife in his right hand. After knocking defendant loose from the deceased she ran over to the store."

Cross-examined by defendant: "The stick I had was about three feet long and about as large around as a man's arm. After I knocked the defendant loose from the deceased he lay there on the ground, and got up and went through the house and up into a cornfield some two or three hundred yards off, when he turned and came back to the house. He went into the house and laid down, where he was afterwards arrested. He seemed to be very stupid."

Redirect: "When defendant went into the cornfield he was running, and was headed off by Henry Thompson and some one else, when he turned and came back to the house."

Tom Copeland was running the saloon where and from whom defendant got the beer the day of the killing. Defendant bought beer

three times on that day, ten cents worth each time. Defendant did not buy but thirty cents worth of beer during that day.

Defendant, being sworn, said: "On the night prior to the final trouble the deceased and myself had some words. She seemed to be very mad at me about something, I do not know what. She told me she intended drinking my blood, and repeated it. The next day I came to the section house for the purpose of getting my clothes and leaving. I went into the room occupied by deceased and myself and laid down on the bed and went to sleep, and after I had been in there about ten or fifteen minutes I woke up and found deceased and her little boy (Patricio Hernandez) in the room, and the boy had a butcher knife. I asked deceased why she was arming the boy for me; that I had done nothing to her, and that I intended going off and letting her alone, and that I wanted my clothes. About this time Mrs. Barker came in and they began screaming at me. I took the knife away from the boy, and after that I have no recollection of what took place. I did not, at any time after I got back to the house, ask Joe Barker for the little butcher knife. Deceased and myself were not married, and had never been. I had known her about three years. Met her first in Laredo, Texas."

Cross-examined by the State: "Julia Vela and myself slept in the same room and in the same bed; slept there all the night before the fatal difficulty. The next morning Mr. Barker had us at work near the section house. At about 12 o'clock I went out to the saloon and got some beer. I drank twenty-five cents worth of beer while I was in the saloon, and bought and carried ten cents worth back to the house with me and divided it with the other Mexicans. I went again to the saloon about 12:30 o'clock p. m. and drank and bought about the same amount of beer, and carried about the same amount back to the house with me. In all that day I bought $1.10 worth of beer. About 1 o'clock p. m. Mr. Barker took the section hands out to work. After we got out I was sick, and I got one of the Mexicans to tell Mr. Barker for me that I was sick, which he did, and Mr. Barker told me that if I was sick to lay off and go over and lie down under a tree. All of which I did, and after I had been there a short time I concluded to quit work on the section, and got up and started home to get my clothes to leave. I went by the saloon on my way back to the section house, and while there I drank thirty cents worth of beer. I then went to the section house and asked deceased to give me my clothes; that I was going to leave. I did not ask Mr. Barker to give me my time, because I had asked him for it before and he refused to give it to me. I was going to leave without getting my money. I had trouble with deceased before and had not spoken to her during the whole day, and had felt mad at her. I bought all of the beer I got that day from Tom Copeland, at the saloon in Dale."

No briefs for either party have reached the Reporter.

SIMKINS, JUDGE.—Appellant was convicted of the murder of his wife, and his punishment assessed at death, from which he appeals.

1. Appellant complains that the court erred in failing to define "malice aforethought" to the jury. The error is not well taken. The court charged the jury, that "malice is a condition of mind showing a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken." Willson's Crim. Stats., sec. 1036. The court further correctly instructed the jury upon express and implied malice.

2. The appellant complains that he was manacled in the presence of the jury, who were thereby prejudiced against him. It is not stated at what time appellant was manacled, nor for what cause. The court says in his explanation, that if appellant was manacled his attention was not called to it, and appellant could not have been injured thereby. It seems, therefore, that no objection or protest was offered by appellant, nor the attention of the court called in any way to the fact, and it can not be here made the ground of reversal.

3. The court did not err in failing to charge on manslaughter. There was no fact in the evidence upon which such a charge could have been predicated. The court correctly submitted only issues of murder in the first and second degrees, as follows: "If you believe from the evidence that the defendant formed the design to kill the woman, or inflict serious bodily injury upon her, deliberately and sedately, by reason of a previous dispute with her, and he did kill her in pursuance of such preconceived design, you will find the defendant guilty of murder of the first degree, and assess his punishment by death, or confinement in the penitentiary for life. If you believe from the evidence that the defendant did kill the woman as alleged, but that he formed the design to do so immediately before committing the act, and under the influence of violent and sudden passion, you may find him guilty of murder in the second degree, and assess his punishment," etc. The evidence shows that appellant quarrelled with his wife the night before the homicide; that the next day he was drinking beer, and after working awhile he stopped, complaining of being sick. He was living at a section house. After dinner he demanded his clothes, stating that he was going to leave. His wife went into the room to get them. He followed, and began shutting the door, when her young son, fearing for his mother's life, got a butcher's knife and attempted to enter. Defendant caught the knife, and in spite of the interference of other parties stabbed his wife, then chased her into the yard, where he succeeded in stabbing her some sixteen times before he was knocked down by a bystander. Appellant then attempted to escape, but was turned back by others and afterwards arrested. His

wife died in a few hours after the wounds were given. The jury have assessed the extreme penalty of the law, and, after a careful examination of all the errors assigned, we are unanimously of the opinion that the verdict should be affirmed.

It is so ordered.

*Affirmed.*

Judges all present and concurring.